IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DANNY JAMES ENQUIST,

      Petitioner,               No. 2: 11-cv-00572 JAM GGH P

     vs.

F. CHAVEZ, Warden,              FINDINGS AND RECOMMENDATIONS

      Respondent.

_____/

Introduction

        Petitioner, a state prisoner proceeding pro se, has filed a petition pursuant to 28 U.S.C. § 2254. This case proceeds on petitioner's first amended petition. On February 6, 2004, petitioner was convicted in Shasta County Superior Count of escape by force or violence (Cal. Pen. Code § 4532(b)(2)) and simple escape (Cal. Pen. Code § 4532(b)(1)), was found to have had two prior strike convictions and was sentenced to a term of 27 years to life.[1] Petition, p. 1; Motion to Dismiss (MTD), p. 1, citing Respondent's Lodged Document 4, p. 1. In this petition, petitioner raises the following grounds, alleging violations of his rights under both the state and federal constitutions: 1) due process violation when the terms of a prior (1991) plea bargain

---

[1] Respondent notes that on March 4, 2005, California's Third District Court of Appeal, while striking petitioner's conviction and sentence for simple escape, otherwise affirmed the judgment and his sentence remained 27 years to life. MTD, p. 2, citing Resp. Lodged Doc. 4.

1

involving future prison sentence enhancements were reneged upon in the imposition of the sentence in the instant case; 2) ineffective assistance of counsel when trial counsel failed to investigate terms of the prior plea agreement with respect to future enhancements and to seek specific performance thereof; 3) trial court error violated due process when evidence petitioner threatened Officer Hildenstab with a gun was allowed; 4) trial court violated due process by refusing petitioner's requested instruction that would have informed jury that petitioner's gun threat was not force.  See Petition.

Motion to Dismiss

Respondent moves for dismissal on the ground the instant petition is untimely under the AEDPA.  See MTD..

The statute of limitations for federal habeas corpus petitions is set forth in 28 U.S.C. § 2244(d)(1):

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of–
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Under 28 U.S.C. § 2244(d)(2):

> The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent

judgment or claim is pending shall not be counted toward any
period of limitation under this subsection.

Following the March 4, 2005, affirmance of judgment by the state appellate court, petitioner filed a petition for review in the California State Supreme Court on April 11, 2005, which was denied on May 11, 2005. MTD, p. 3, citing Rsp. Lodged Docs. 4-6. Petitioner's conviction became final on August 9, 2005, ninety (90) days after the state supreme court denied his petition for review on direct appeal on May 11, 2005. Bowen v. Roe, 188 F.3d 1157, 1158-59 (9th Cir. 1999) ("holding] that the period of 'direct review' in 28 U.S.C. § 2244(d)(1)(A) includes the [ninety-day] period within which a petitioner can file a petition for a writ of certiorari with the United States Supreme Court, whether or not the petitioner actually files such a petition."). As respondent observes (MTD, p. 3), the AEDPA statute began to run the following day, on August 10, 2005. Patterson v. Stuart, 251 F.3d 1243, 1246 (9th Cir. 2001). Therefore, absent any applicable tolling, petitioner had until August 9, 2006, to file a timely federal petition.

Petitioner's first petition for writ of habeas corpus in the state superior court, by liberal application of the mailbox rule,[2] was filed on December 2, 2009 (but file-stamped December 7, 2009), and was denied on January 27, 2010, citing, inter alia, In re Robbins, 18 Cal.4th 770, 780-781 (1998). Rsp. Lodged Docs. 11-12. His petition to the Third District Court of Appeal, per mailbox rule, was filed on March 11, 2010 (file-stamped April 14, 2010), and was denied on April 22, 2010. Rsp. Lodged Docs. 13-14. His habeas petition to the state supreme court, on May 3, 2010, under mailbox rule (file-stamped on May 6, 2010), was denied on December 15, 2010 (with text docket entry citing In re Robbins, 18 Cal.4th 770, 780 (1998). Rsp. Lodged Docs. 15-16. Petitioner filed his original federal habeas petition (file-stamped March 1, 2001), by application of the mailbox rule, on February 14, 2011.

---

[2] Pursuant to Houston v. Lack, 487 U.S. 266, 275-76, 108 S. Ct. 2379, 2385 (1988)(pro se prisoner filing is dated from the date prisoner delivers it to prison authorities). Stillman v. Lamarque, 319 F.3d 1199, 1201 (9th Cir. 2003)(mailbox rule applies to pro se prisoner who delivers habeas petition to prison officials for the court within limitations period).

3

As respondent observes, both the Shasta County Superior Court and the California Supreme Court, citing In re: Robbins, supra, found the petition untimely. MTD, p. 3. The United States Supreme Court has explained that in order for a state habeas petition to be "properly filed" for purposes of statutory tolling, the petition's delivery and acceptance must be in compliance with the laws and rules governing such filings. Pace v. DiGuglielmo, 544 U.S. 408, 413-14, 125 S.Ct. 1807 (2005). "[T]ime limits, no matter their form, are 'filing' conditions." Pace, at 417, 125 S.Ct. at 1814. "When a post-conviction petition is untimely under state law, that is the end of the matter for purposes of § 2244(d)(2)." Id. at 414, 125 S.Ct. at 1812.

In addition, as respondent argues, petitioner did not file his initial state court habeas petition until December [2 or] 7, 2009, more than three years after the expiration of the statute of limitations on August 9, 2006. MTD, p. 4. Section 2244(d)(2) can only pause a clock not yet fully run; it cannot "revive" the limitation period once it has run (i.e., restart the clock to zero). Thus, a state court habeas petition filed beyond the expiration of AEDPA's statute of limitations does not toll the limitation period under § 2244(d)(2). See Ferguson v. Palmateer, 321 F.3d 820, 823 (9th Cir.2003); Jiminez v. Rice, 276 F.3d 478, 482 (9th Cir.2001). Petitioner filed his original federal habeas petition, by application of the mailbox rule, on February 14, 2011. Therefore, petitioner is time-barred by four and a half years from pursuing this action unless he can show entitlement to equitable tolling. From the outset, petitioner expressly conceded his petition to be untimely under the one-year AEDPA statute of limitations in both the original [dismissed] petition (docket # 1, p. 39) and the first amended petition. See First Amended Petition, docket # 18, p. 33. He argues in his first amended petition for the application of equitable tolling on the grounds that he suffers from mental deficits. FAP, dkt # 18, pp. 33-43. He argues in his opposition that his petition should be equitably based on his being mentally impaired during the filing period, citing the relatively recent "two part Bills test," and asks for an evidentiary hearing to prove his mental impairment during the filing period. Opposition (Opp.), p. 1, citing Bills v. Clark, 628 F.3d 1092 (9th Cir. 2010).

Applicable Equitable Tolling Standards

The Supreme Court has fairly recently held "like all 11 Courts of Appeals that have considered the question...that § 2244(d) is subject to equitable tolling in appropriate cases." Holland v. Florida, ___ U.S. ___, 130 S. Ct. 2549, 2560 (2010). Petitioner relies on Laws v. Lamarque, 351 F.3d 919 (9th Cir. 2003), for support for his argument for equitable tolling based on a claim of mental illness. Noting therein that equitable tolling is available in this circuit only when "'when extraordinary circumstances beyond a prisoner's control make it impossible to file a petition on time' and 'the extraordinary circumstances were the cause of his untimeliness,'" the Ninth Circuit observed that grounds for equitable tolling under § 2244 (d) are "highly fact-dependent." Laws, supra, at 922, citing Spitsyn v. Moore, 345 F.3d 796, 799 (9th Cir. 2003); id., quoting Whalem/Hunt v. Early, 233 F.3d 1146, 1148 (9th Cir. 2000). The Ninth Circuit held that it was an abuse of discretion for the district court to deny Laws's petition, where he claimed he was mentally ill between April 23, 1996 (the date of AEDPA's enactment) and May 16, 2000, when his first state habeas petition was filed and entitled to equitable tolling, without the court's having ordered development of the factual record supporting the claim. Id., at 922-23. The case also makes clear that the Ninth Circuit observed that it had previously "held that a 'putative habeas petitioner's mental incompetency [is] a condition that is, obviously, an extraordinary circumstance beyond the prisoner's control,' so 'mental incompetency justifies equitable tolling' of the AEDPA statute of limitations." Laws, supra at 923, citing Calderon v. U. S. Dist. Ct. (Kelly), supra, 163 F.3d at 541. In doing so, the Laws Court noted, as a backdrop, that the trial court had expressed its concern about Laws's competency and had ordered psychiatric examinations and a hearing under Cal. Penal Code § 1368, and had found, in the face of conflicting expert testimony that Laws was "'for the present at least'" competent to stand trial. Laws, supra, at 921. The Laws Court stated that the determination of competency at the time of trial (despite the evidence of serious mental illness) did not bear on the competency of Laws for the period of time at issue for which no medical records had been provided.

5

A Ninth Circuit panel has set forth that "eligibility for equitable tolling due to mental impairment requires the petitioner to meet a two-part test:"

> 1) *First*, a petitioner must show his mental impairment was an "extraordinary circumstance" beyond his control, see *Holland*, 130 S.Ct. [2549 ]at 2562 [(2010)], by demonstrating the impairment was so severe that either
>
> > (a) petitioner was unable rationally or factually to personally understand the need to timely file, or
> >
> > (b) petitioner's mental state rendered him unable personally to prepare a habeas petition and effectuate its filing. [Footnote 2–see below]
>
> 2) *Second*, the petitioner must show diligence in pursuing the claims to the extent he could understand them, but that the mental impairment made it impossible to meet the filing deadline under the totality of the circumstances, including reasonably available access to assistance. See *id*.

Bills v. Clark, 628 F.3d 1092, 1099-1100 (9th Cir. 2010) [emphasis in original].

At footnote 2, the panel clarified that, under the first prong, the required elements are broader, that is, disjunctive rather than conjunctive, stating:

> The magistrate judge stated a habeas petitioner must show "he was unable by reason of mental defect to understand his need to timely file a habeas petition *and* unable to take steps to effectuate that filing." ([E]mphasis added [by appellate panel]). Under our formulation, a petitioner would be entitled to equitable tolling if he could show either of those conditions were met: *either* he did not understand his need to timely file *or* his mental impairment made him unable to take steps to effectuate that filing. In either case, if the mental impairment is so severe that it causes the untimely filing, the petitioner is entitled to equitable tolling. [Emphasis in original].

"The court should examine whether the petitioner's mental impairment prevented him from locating assistance or communicating with or sufficiently supervising any assistance actually found." Bills v. Clark, 628 F.3d at 1101.

> The availability of assistance is an important element to a court's diligence analysis. For example, if prison officials or even other prisoners were readily available to assist Bills in filing his habeas petition but Bills refused to accept their assistance, a court could

>conclude Bills may not have been diligent in pursuing his claims such that he is entitled to equitable tolling. That is not to say a prisoner fails the diligence requirement for refusing jailhouse assistance. It is only part of the overall assessment of the totality of circumstances that goes into the equitable determination. Thus, in many circumstances, the existence of such help would be highly relevant to the question of whether a petitioner's mental condition made it impossible to file a timely petition. But the availability of jailhouse assistance could also cut the other way. If legal help is available only because a prisoner has to resort to bribery or succumb to extortion, and a prisoner does not do so, a court would not find a lack of diligence. Here it is unclear what assistance Bills had and how that assistance, if any, bore on his ability to meet the filing deadline.

Id. at 1101.

Petitioner seeks to analogize his circumstances to those of the petitioner in Laws v. Lamarque, contending, in his first amended petition, that he, like petitioner Laws, had a Cal. Pen. Code § 1368 hearing and that he, like Laws, "was found to be competent to stand trial but after direct appeal it all went bad for Laws, just as it did here for petitioner... ." FAP, p. 34. Petitioner avers that he is "entitled to further factual development of, or an evidentiary hearing on[,] the issue of whether his mental illness prevented him from timely filing his petition for writ of habeas corpus ... ." Id. Petitioner avers that notwithstanding his having been found competent to stand trial, he was "mentally incompetent during the period of time in which his petition should have been filed." Id. In his brief opposition to the motion (generally referencing his more detailed presentation in his FAP), petitioner asks for an evidentiary hearing to prove his mental impairment during the filing period. Opposition (Opp.), p. 1, citing Bills v. Clark, 628 F.3d 1092.

The period for which petitioner must show entitlement to equitable tolling is the time frame which includes/precedes the statutory expiration date for filing a federal petition (August 9, 2006) running through to the date of the filing of his first state court habeas petition (December 2, 2009), or at a minimum, a period of three years and four months. The records petitioner primarily relies on, however, as respondent points out, date back to 2003. MTD, p. 4. While petitioner notes (FAP, p. 36) from the Cal. Pen. Code § 1026 psychological evaluation by

7

Kent Caruso, Ph.D, identified as a licensed clinical psychologist, dated April 28, 2003 (Exhibit J to first amended petition (FAP) at dkt # 8-1, pp. 54-62) and filed on May 5, 2003, that Dr. Caruso found petitioner was "not very articulate, and very much lacking in insight," he also considered petitioner "to be a good informant and historian." Dkt #8-1, Ex. J, p. 55.

Dr. Caruso reported, under "Neurological-Intellectual Presentation," inter alia, the following:

> Mr. Enquist's results on this abbreviated form of the Verbal part of the Wechsler Adult Intelligence Scale - Revised would suggest that his tertiary or left hemisphere-verbal intellectual problem solving abilities range from upper borderline mental retardation to bottom end of the low average range. He is not someone who is very comfortable with his own mental faculties, he seems rather poorly education, and without any doubt he tends to be much more of a doer than he is a thinker in his overall problem solving style.
>
> Generally speaking Mr. Enquist will be able to exhibit functional encoding or decoding skills, that is[,] word knowledge and vocabulary skills, and basic ability to extend range of ideas and thinking. He is, at the same time, going to present to others as being rather immature and adolescent like when it comes to his general reasoning and logical thinking abilities, ability to make good judgment and common sense decisions, and conceptual thinking. He has little capacity to manipulate abstractions. Therefore Mr. Enquist is usually going to be disinclined to tackle intellectual problem solving activities that might require analytical and critical thinking; and if required to participate in such activities, he will probably not fare very well.

Dkt #1-1, Ex. J, p. 56.

Under "Mental Status Presentation," Dr. Caruso reported:

> Mr. Enquist's eye contact was good and his affect was appropriate but depressed. He was alert and oriented to person, time, and place. Ego strength appeared to be intact and reality testing was functional. There were no remarkable signs of any tendencies on his part toward either the cognitive or perceptual distortion of reality; and although Mr. Enquist provided to me a rather chronic and significant history of intervention with various mental health professionals, none of that history indicated tendencies toward serious disturbance in reality testing. Mr. Enquist's thinking was clear and lucid and his expressive and receptive language skills were fair. There were no real oddities or peculiarities in his communicational or relationship style or demeanor, and there were no signs of current psychotic disorder, or any remarkable organicity

> or neurocognitive impairments, by way of illusional or delusional thinking, circumstantial or tangential thinking, perseveration, poverty of content, logical deficit, confused or disoriented thinking, or fragmented or disorganized thinking.

Id., at 55.

In his clinical profile of petitioner, Dr. Caruso asks the question whether or not petitioner's "significant poly drug abuse contributed to and/or exacerbated Mr. Enquist's emotional and psychological problems" and whether petitioner's symptoms of "Bipolar Disorder" (which diagnosis Caruso places in quotation marks and expresses doubt about[3]) or of "more recently diagnosed Adult Deficit Hyperactivity Disorder" were "based solely in physiological malfunction or a messed up brain chemistry" or were the result of "the introduction of lots of drugs such as LSD and PCP." Id., at 59.

Petitioner also references Dr. Caruso's statement in his clinical profile that petitioner "is definitely not the brightest guy." FAP, p. 37; Dkt #8-1, Ex. J, at 59.

> He is not a very capable learner, and obviously he does not learn well from experience. All clinical and behavioral-historical evidence strongly indicate that he tends to be very much lacking in regulation of impulses; and someone who tends to problem solve and otherwise move about his physical and social milieus in a kind of impatient, thoughtless, reckless, and risk taking manner. Mr. Enquist was probably more correct tha[n] he thought when he told me, on several occasions, that he does not have very much common sense.

Id., at 59-60.

Dr. Caruso's conclusion was that there was little or no evidence that suggested petitioner was suffering from a serious mental disorder that rendered him incapable of

\\\\

\\\\

---

[3] Dr. Caruso questioned whether petitioner was correctly diagnosed with bipolar disorder and had serious doubts that, even if he were, petitioner suffered from the "accompanying psychotic features," finding that petitioner's background did not evidence "a confirmed history of psychotic disorder." Dkt #8-1, Ex. J, p. 60.

understanding the nature and quality of his actions on or around June 5, 2002[4] (the date of the commitment offense). Id., at 61-62. Moreover, respondent points to Dr. Caruso's defense witness testimony at the competency trial (on cross-examination), wherein, respondent asserts, he estimated that at least 50 percent of people in prison would have IQ scores similar to that of petitioner. Respondent's Lodged Document 19, Reporter's Transcript (RT), p. 139. However, what he actually said, quoting the transcript, was even more dramatic in terms of petitioner's comparative IQ:

> All the people in the prison system, if measured by this instrument, would have I.Q.'s similar to Mr. Enquist, and if you evaluated them in terms of their abilities to make good judgments and common sense, their reasoning and logical thinking they'd all be described pretty much the same way. And this is why so many of them are in the prison system. That is the level they deal with in terms of facing responsibility, solving problems, dealing with their impulses and urges.

Id.

An August 13, 2003, letter directed to Judge Curle of the Shasta County Superior Court from a Dr. Aravind Pai, reported on Dr. Aravind's psychiatric evaluation of petitioner made on August 3, 2003, pursuant to Cal. Pen. Code § 1368, to determine whether petitioner was competent to stand trial and to assist his attorney in his defense in a rational manner, concluding that petitioner was able to do so. Dkt # 8-1, Ex. K, pp. 64-66. Although finding that petitioner had a long history of polysubstance abuse as well as past antisocial behaviors, used poor judgment and was "not a very bright man" academically, who might intellectually "be functioning below average to low average intelligence," the psychiatrist determined that petitioner showed no evidence of psychotic symptoms or any major mental illness, understood the charges, knew right from wrong, was "in total touch with reality," and was "not confused" or "disoriented." Id., at 66.

\\\\\

---

[4] Petitioner attempted a jail escape at that time. Dkt # 8-1, Ex. K, pp. 65-66; see also, Ex A, Third District Court of Appeal opinion (unpub.).

Petitioner refers to a review by a Dr. Carlson, a clinical psychologist who assessed petitioner in 2003 both under Cal. Pen. Code §§ 1026 and 1368 (RT, 27, 29).  FAP, p. 39. Petitioner references Dr. Carlson's testimony that petitioner reported that he had hallucinations (apparently petitioner stated this was as a result of abusing PCP since he was "a young kid"), confirmed that petitioner had a score of 72 in the verbal section of the Wechsler Adult Intelligence Scale Revised test he was administered, meaning he was in the third percentile and 97% of the population would have scored higher, and that petitioner had reported that he had been in Special Ed as a child.  RT 32, 38-40.  Petitioner references Dr. Carlson's testimony that petitioner had reported that he had been prescribed Sinequan and Tegretol in the past and that was being prescribed in the jail at that time Sinequan, Clonopin and Elavil which drugs Dr. Carlson testified were designed to treat mental or behavioral symptoms.  FAP, p. 39, citing RT 51.  Dr. Carlson reported that on the Stroop color test, petitioner scored a 77, which the doctor called "very uncommon" and which probably meant petitioner "for starters, is not a very good reader."  FAP, p. 39 &  RT 52. On the second part of the Stroop test, a color word test, petitioner scored a 38, which put him behind 99% of people taking that test.  FAP, 39-40, RT 53-54.  Interestingly, petitioner also notes that Dr. Carlson testified that petitioner, in his opinion, measured lower than he was capable of (FAP, p. 40, RT 57:

> Q. Okay.  In summing it up, you felt he had a low intellect, very low intellect; correct?
> A. Well, he measures low.
> Q. All right.
> A. My personal opinion is he measures lower than I think Danny is really capable of.

RT 57.

In part, this assessment was based on "the fact his vocabulary is high."  RT 57.  As respondent points out, Dr. Carlson opined that while petitioner tested borderline, that this was "a low estimate of his innate ability" and that if he were to adjust the assessment one way or another he would "tend to go up a few points for [petitioner] rather than go down into the mildly retarded

11

ranges, given his ability to communicate." MTD, p. 5, RT 58. Based on his testing, Dr. Carlson found that petitioner was not mentally retarded and had conceptual capacity. RT 97. While Dr. Carlson did believe that petitioner had "a mental disorder" based on "some form of depression" and a "substance abuse diagnosis," he did not observe bizarre behavior during his interview of petitioner and found no evidence of delusions, hallucinations, mania, formal thought disorder or of impairment of verbal coherence. MTD, p. 5 & RT 97, 107. Dr. Carlson believed that petitioner would be able to assist his counsel in a meaningful way. MTD, p. 5, citing RT 122.

Petitioner herein has produced a large volume of his medical records. See dkt # 9, totaling 222 pages, going back as far as 2002. While these records show that petitioner has long been on a number of medications, included psychotropic, and suffered depression (logically, in light of his life sentence) within periods relevant to this action, it does not demonstrate the extraordinary circumstance that precluded him from initiating his state habeas corpus filings sooner than he did and makes no showing as to how things improved for him to be able to file them when he did. As respondent argues, petitioner himself states that "[t]here is no magic pill for retardation to make a person smarter." MTD, p. 8, citing FAP (dkt # 8), [p. 42].[5] Petitioner contends that his mental capacity has not increased since his trial Cal. Pen. Code § 1026 and § 1368 evaluations and that he continues to receive daily psychiatric medications and to be diagnosed as CCCMS within the prison mental health program. Id. However, by this, petitioner proves too much. By conceding that he still suffers from the same mental deficits to this day, he does not show what obstructed him from making his state court habeas filings until he ultimately did and the instant filing as well. In other words, he does not demonstrate that he was sufficiently diligent in trying to meet the requisite timelines during the period for which he seeks equitable tolling if his situation the status quo remains unchanged. And what petitioner fails to provide is any indication of what changed during and beyond the AEDPA statutory period up to his filing of

---

[5] Court's electronic pagination is referenced.

his state court petitions. In other words, during the entire period up to this very point in time, petitioner has had the same intellectual challenges and received medication and was on the CCCMS level of care, so that petitioner does not show the requisite extraordinary circumstance when he fails to meet his burden to show how he was precluded for an extended period of time to commencing the filing of his habeas petitions, a period during which he was evidently able to file grievances, etc. Petitioner emphasizes in his opposition the affidavit signed by an inmate named Andrew Martin, which petitioner insists shows he "was unable to file a simple state habeas corpus petitioner on his own." Opp., p. 2. However, while the affidavit by Inmate Martin indicates that petitioner apparently had great difficulty in filing the state habeas petition to the state court of appeal,[6] Mr. Martin is quite clear that he only assisted petitioner with the filing and not the preparation of the petition (although he does state that he worked on the instant federal petition). Martin Affidavit, FAP, p. 31. Although Inmate Martin correctly recognizes that he is "not even remotely qualified" to make a determination that petitioner is "mentally challenged," he believes him to be. None of this, however, demonstrates why petitioner could not have initiated the initial state court filing in the superior court earlier, which he apparently filed correctly, whether he had assistance or not in preparing any or all of his state court petitions. Thus, although petitioner has shown that he suffers from conditions requiring medication, he does not come close to making the showing of the second prong of the Bills standard, i.e., he does not show he was diligent in pursuing his claims and any mental impairment he suffered made it impossible for him "to meet the filing deadline under the totality of the circumstances, including reasonably available access to assistance." Bills v. Clark, 628 F.3d at 1100.

       The court will not order an evidentiary hearing when the important point of diligence is left completely unaddressed by petitioner.

---

[6] Petitioner includes documentation that shows petitioner's appellate court habeas petition was returned three times by the clerk of that court. Affidavit of Andrew W. Martin, FAP, p. 31, citing Ex. I.

Accordingly, IT IS HEREBY RECOMMENDED that respondent's September 8, 2011 (docket # 23), motion to dismiss the petition as untimely be granted and this case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: July 10, 2012

                                 <u>/s/ Gregory G. Hollows</u>
                          UNITED STATES MAGISTRATE JUDGE

GGH:009
enqu0572.mtd